THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BAY PARK CENTER FOR NURSING AND REHABILITATION, LLC, d/b/a PINNACLE MULTICARE NURSING AND REHABILITATION CENTER,<br>Plaintiff,<br><br>– against –<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services, MEHMET OZ, in his official capacity as Administrator of the Centers for Medicare & Medicaid Services, THOMAS MARCH BELL, in his official capacity as Inspector General of the United States Department of Health and Human Services, and NATIONAL GOVERNMENT SERVICES, INC. d/b/a Wellpoint Federal,<br><br>Defendants. | Case No. 26-cv-1620 (JGK)<br><br>**AMENDED COMPLAINT** |

Bay Park Center for Nursing and Rehabilitation, LLC, d/b/a Pinnacle Multicare Nursing and Rehabilitation Center ("Pinnacle"), by its undersigned attorneys, as and for its Amended Complaint, respectfully allege as follows:

## Nature of the Action

1. This is an action to prevent the United States Department of Health & Human Services ("HHS"), the Centers for Medicare and Medicaid Services ("CMS"), and National Government Services, Inc. ("NGS") d/b/a Wellpoint Federal, from recouping more than $31 million from Pinnacle Multicare Nursing and Rehabilitation Center based on an administrative process riddled with constitutional violations and a broken promise to put "patients over paperwork" during the COVID-19 pandemic.

2. Pinnacle is a fifteen-story, 480-bed skilled nursing facility located in the Co-op City community of the Bronx, New York, offering both short term rehabilitation and long-term care for

its patients, many of whom are low income. As of 2020, Co-op City had a total population of approximately 44,000 people, 30 percent of whom were seniors and the majority Black and/or Latino. Pinnacle has approximately 500 medical professionals and staff.

3. Pinnacle served vulnerable residents in the epicenter of the COVID public health emergency ("PHE"), operating under emergency conditions and evolving governmental guidance to preserve hospital capacity and continuity of care.

4. Despite the extreme challenges presented by COVID, Pinnacle's efforts to provide exceptional care to its patients were an undeniable success.

5. Between the onset of COVID in early 2020 and the end of February 2023, a total of only two (2) deaths attributable to COVID occurred at Pinnacle. So successful were Pinnacle's efforts that New York State officials briefly investigated Pinnacle's COVID mortality data to confirm its accuracy.

6. Pinnacle depends on Medicare Part A as a critical revenue source for its operations. As a skilled nursing facility ("SNF") serving an elderly, medically fragile population in one of the nation's poorest and most chronically ill communities, Pinnacle relies heavily on Medicare reimbursement to fund the round-the-clock clinical care, licensed nursing services, rehabilitation therapies, and specialized medical interventions its residents require.

7. On or about July 1, 2022, in the middle of the COVID-19 PHE, the U.S. Department of Health & Human Services Office of Inspector General ("OIG") began an audit of Medicare Part A reimbursements paid to Pinnacle in calendar years 2020 and 2021 (the "audit period").

8. This audit culminated in a final OIG report three years later, issued on November 14, 2025, that alleged that Pinnacle had received Medicare overpayments of at least $31.2 million

for calendar years 2020 and 2021. This amount is based on a purported finding of a 99 percent error rate in all claims submitted during the audit period.

9. CMS, acting through NGS, sent Pinnacle an initial request letter a mere 75 days later on January 29, 2026, demanding repayment of $31,227,884 no later than February 27, 2026 (the "Demand Letter"). According to the Demand Letter, failure to repay the entire amount by that deadline will result in interest accruing at a rate of 11.625%, or the equivalent of nearly $10,000 ***per day***.

10. The Demand Letter, and the OIG Report upon which it is based, evince a staggering disregard for basic principles of constitutional due process, to say nothing of statutory law.

11. *First*, the OIG Report and the Demand Letter audited claims for compliance with a regulatory framework that ***did not exist*** at the time the care was provided and the claims were submitted.

12. *Second*, the OIG Report and the Demand Letter blatantly ignore legally binding state and federal waivers, orders, and guidance that ***were*** in place during the audit period to address the COVID PHE.

13. *Third*, the secrecy surrounding the audit process and methodology deprived Pinnacle of basic notice of how the determination was made and who made it.

14. *Fourth*, the demand for immediate repayment of $31 million, with a threat of punitive interest accruing by the day, regardless of the status of any administrative appeal or judicial proceeding, deprives Pinnacle of a meaningful opportunity to be heard.

15. Defendants' abrupt demand for over $31 million plus interest would immediately paralyze Pinnacle by rendering it unable to pay its employees and would result in the shutdown of the entire nursing facility—leaving highly vulnerable patients without life-saving care, depriving

hundreds of individuals of jobs and income, and divesting New York City of this critical medical facility. The Court's intervention is necessary to prevent irreparable harm to Pinnacle's patients, its medical professionals and staff, and the greater New York City community that Pinnacle serves.

16. For the reasons set forth below, the Court should grant Pinnacle judgment declaring that the demand for recoupment is unconstitutional and unlawful; ordering that the Demand Letter, the OIG Report, the Corrected Redetermination Decision and the Revised Demand Letter be withdrawn; and enjoining Defendants from enforcing, collecting, offsetting, or recouping the alleged overpayments.

**Jurisdiction and Venue**

17. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 1395 et seq. (Medicare Act), 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory judgment), 2202 (injunctive relief), and 1361 (mandamus relief), and 5 U.S.C. §§ 702 and 706 (scope of review).

18. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1) because defendants Kennedy, Oz, and Bell are officers or employees of the United States, because Pinnacle is a domestic limited liability company organized and existing under the laws of the State of New York with its principal place of business in this district, and because a substantial part of the events or omissions giving rise to the claims occurred here.

19. Plaintiff challenges the legality and constitutionality of Defendants' actions, including the fundamentally deficient process through which the OIG Report and resulting overpayment demand were issued. Those procedural defects are themselves the subject of this action, will cause immediate and irreparable harm absent judicial intervention, and cannot be remedied through the claim-by-claim administrative review available to Pinnacle. Accordingly, Pinnacle was not required to complete the administrative appeals process before seeking judicial

review. Nevertheless, Pinnacle presented its claims to CMS and, in order to prevent recoupment, has diligently pursued the available administrative process by timely seeking redetermination and reconsideration. Reconsideration remains pending. To the extent further exhaustion is deemed necessary, it should be excused because Plaintiff's constitutional and procedural challenges are collateral to the claim-by-claim merits, the administrative process has not provided meaningful or timely review of the defects challenged here, and requiring further exhaustion would expose Pinnacle to irreparable injury before meaningful judicial review becomes available.

20. An actual, justiciable controversy exists between Plaintiff and Defendants concerning Defendants' authority to demand, assess, and/or recoup alleged Medicare overpayments from Plaintiff under the Medicare Act and its implementing regulations.

21. Defendants have asserted that Plaintiff is obligated to reimburse Medicare an amount in excess of $31 million, based on determinations that are unlawful and coercive.

22. Defendants' actions exceed their statutory authority under the Medicare Act, 42 U.S.C. § 1395 et seq., and violate the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, as well as the Due Process Clause of the Fifth Amendment.

23. Plaintiff faces irreparable harm, including but not limited to:

a. Disruption of cash flow necessary to provide ongoing medical services;

b. Damage to contractual and operational stability; and

c. Harm to its patients, medical professionals, staff, and community.

24. Plaintiff lacks an adequate remedy at law.

25. The balance of equities favors Plaintiff, and the public interest is served by ensuring lawful administration of the Medicare program and compliance with constitutional due process.

26. Defendants owe Plaintiff a clear, nondiscretionary duty to follow the procedural requirements of the Medicare Act and APA, and refrain from enforcing recoupment demands issued in violation of law.

27. Defendants have failed and refused to perform these mandatory duties by demanding recoupment in violation of the law.

**Parties**

28. At all times relevant to this action, Pinnacle was and remains a domestic limited liability company duly organized and existing under the laws of the State of New York with its principal place of business at 801 Co-Op City Boulevard, Bronx, New York 10475. Pinnacle is a skilled nursing facility as defined in 42 U.S.C. § 1395i-3.

29. Defendant Robert F. Kennedy, Jr. ("Kennedy" or the "HHS Secretary"), is Secretary of the United States Department of Health and Human Services.

30. Defendant Mehmet Oz ("Oz" or the "CMS Administrator") is Administrator of the Centers for Medicare & Medicaid Services.

31. Defendant Thomas March Bell ("Bell" or the "HHS IG") is Inspector General of the United States Department of Health and Human Services.

32. Defendant NGS d/b/a Wellpoint Federal is the Medicare Administrative Contractor ("MAC") for the region that includes New York. On information and belief, NGS is a corporation organized under the laws of the state of Indiana. On information and belief, NGS is a subsidiary of Elevance Health, Inc. NGS acts as an agent of, on behalf of, and at the direction of, HHS and CMS with respect to the claims, audit, OIG Report, and Demand Letter at issue in this suit.

## Facts

## Background on Pinnacle

33. Pinnacle Multicare Nursing and Rehabilitation Center is a fifteen-story, 480-bed skilled nursing facility, one of the largest in New York City and State, serving medically complex residents and maintaining a record of quality care and regulatory compliance.

34. Pinnacle is located in the Bronx, in a federally designated primary care health professional shortage area. Pinnacle serves a resident population that comes from New York City, Westchester County, and beyond.

35. Pinnacle has approximately 500 staff members on average.

36. Pinnacle served vulnerable residents in the epicenter of the COVID-19 pandemic in NYC, operating under emergency conditions and evolving guidance to preserve hospital capacity and continuity of care.

37. The Bronx has some of the highest rates of poverty, chronic illness, and limited healthcare access in New York City and the country and was one of the nation's earliest and hardest-hit COVID-19 hotspots.

38. More than almost any other borough, the Bronx entered 2020 with disproportionate levels of asthma, diabetes, cardiovascular disease, and other comorbidities that placed its residents at heightened risk of severe outcomes once COVID-19 arrived.

39. Many Bronx residents, including the families of Pinnacle's staff and residents, worked essential, front-line jobs such as first responders, transit, sanitation, hospital support, and food service jobs that could not be done remotely. These structural realities made the Bronx uniquely vulnerable as the pandemic began to spread.

40. Pinnacle relies on Medicare Part A as a critical revenue source for its operations. As a skilled nursing facility serving an elderly, medically fragile population in one of the nation's poorest and most chronically ill communities, Pinnacle relies heavily on Medicare reimbursement to fund the round-the-clock clinical care, licensed nursing services, rehabilitation therapies, and specialized medical interventions its residents require.

41. Medicare Part A is a governmental insurance program that helps to pay for, as relevant here, inpatient care at skilled nursing facilities, such as Pinnacle. Medicare covers the majority of short-term post-acute stays at Pinnacle, often following hospitalization for conditions such as stroke, cardiac events, respiratory illnesses, and orthopedic procedures. Those stays require intensive skilled care. The payments Pinnacle receives under Medicare Part A directly support staffing levels, infection-control protocols, clinical equipment, medication administration, respiratory treatments, IV therapy, and rehabilitation services, as well as food to support the health and well-being of Pinnacle's patients.

42. Without regular Medicare reimbursement, Pinnacle could not maintain the staffing, clinical capacity, or operational infrastructure necessary to provide safe and effective skilled nursing care.

43. In short, Medicare funding is the financial lifeline that allows the facility to remain open. If Medicare reimbursements were withdrawn or interrupted, Pinnacle could not maintain staffing, could not comply with regulatory standards, and could not provide the skilled medical care its residents require.

44. The result would be catastrophic: Pinnacle would be forced to cease operations, its doors would close, and hundreds of vulnerable residents, many with no viable alternative placements, would face immediate and life-threatening displacement.

**The Centers for Medicare and Medicaid Services unveil a new system for reimbursement**

45. On October 1, 2019, immediately prior to the PHE, the Centers for Medicare and Medicaid Services ("CMS") implemented a new system for determining Medicare Part A payments for skilled nursing facilities known as the Patient Driven Payment Model ("PDPM"). This PDPM system uses six components to determine payments to SNFs.

46. When the PDPM system debuted in October 2019, it was a massive change in the way SNFs and other healthcare providers had to submit their Medicare reimbursement claims. PDPM replaced the Resource Utilization Groups Version IV ("RUG-IV") system that had been in place for the prior 12 years. CMS was aware there would be a need for education and training as part of the implementation.

47. Under the PDPM, an SNF must complete a Minimum Data Set ("MDS") assessment for each Medicare enrollee within the first eight days of that person's stay at the SNF. The MDS includes assessments of the patient's functional and cognitive status, psychosocial functioning, geriatric syndromes, life care wishes, diagnoses, and treatments.

48. The MDS assessment is then used to determine the Health Insurance Prospective Payment System ("HIPPS") codes that serve as the basis for Medicare payment determinations.

49. PDPM calculates payment by assigning each patient to case-mix groups across five separate clinical components (Physical Therapy, Occupational Therapy, Speech-Language Pathology, Nursing, and Non-Therapy Ancillaries) based on diagnoses, functional scores, and comorbidities, and then applies preset Medicare rates for each component. Those component rates are added together and adjusted over the length of stay (with certain components tapering down), producing a single per-diem payment meant to reflect the patient's overall medical complexity rather than services delivered.

50. According to CMS, the purpose of switching to the PDPM system was to improve payment accuracy and appropriateness by focusing on the patient, reduce administrative burden on providers, and improve payments to underserved beneficiaries.

51. As CMS put it at the time of the change, “there is no transition period between RUG-IV and PDPM.” *See* Declaration of Mathew Varghese (“Varghese Dec.”) Ex. A. SNFs were simply expected to start using the new reimbursement system effective October 1, 2019.

**HHS and CMS’s Rollout of PDPM Was a Disaster from the Start**

52. From the beginning, even before the onset of COVID-19, the rollout of the new PDPM model by HHS and CMS was riddled with problems.

53. In the days and months following the launch of the PDPM system on October 1, 2019, CMS repeatedly modified, clarified, and updated the operational instructions governing how skilled nursing facilities were required to submit, code, and correct Medicare Part A claims under the new PDPM billing model.

54. CMS issued its changes through its Medicare Administrative Contractors (“MACs”). Defendant NGS was and is the MAC for the region that includes Pinnacle.

55. Skilled nursing facilities and other healthcare providers were required to adapt to this constantly changing guidance to interpret the PDPM rules.

56. That CMS had failed to adequately prepare for the rollout of its new system became clear almost immediately.

57. On October 4, 2019—a mere three days after PDPM went into effect—CMS issued Change Request 11454, implementing significant manual updates to the Medicare manuals effective November 5, 2019. This change added or revised instructions relating to payment calculations, billing, processing, and claim elements. CMS’s original guidance required immediate revision as providers began using the system in real time.

58. CMS's billing systems also initially miscalculated PDPM rates, forcing providers to use cumbersome, makeshift solutions. On February 27, 2020, after the Secretary of HHS had already declared a PHE related to the COVID-19 pandemic, CMS again provided "updated" guidance, stating that SNF PDPM "initial claims that are processed out of sequence are not paying the correct Variable Per Diem (VPD)-adjusted rate. Also, all adjustment claims are not processing correctly. Claims need to process in date of service order for each stay for the VPD to calculate correctly." Varghese Dec. Ex. B.

59. SNFs were left to fend for themselves on this issue for the next ***eight months***, with CMS advising in this February guidance, "We will correct this issue in October." CMS directed that it was incumbent upon the SNFs to make up for CMS's failure, advising that SNFs should "[s]ubmit claims in sequence by waiting at least 2 weeks before billing subsequent claims," and "adjust claims, cancel the initial claim and all subsequent claims in the SNF stay then rebill in sequential order; or, hold adjustments (when allowable) until October when they will process correctly."

60. In other words, CMS rolled out the PDPM system before it was ready, then told SNFs it was their problem for the next eight months—all while an unprecedented global health crisis was taking shape.

61. In that same February 27, 2020, directive, CMS also explained it planned to implement a new diagnosis code for COVID-19—but again, not until October 2020.

**CMS continually changed its guidance throughout the audit period**

62. These early failures set the tone for CMS's handling of PDPM for the next few years. The timeline of events makes clear that the regulatory framework that CMS, NGS, and OIG

ultimately applied in their audit of Pinnacle simply did not exist at the time the services were rendered.

63. CMS itself had no idea how PDPM worked or what the rules relevant to it were in 2020 and 2021. It was only with the benefit of years of revisions and clarifications that the final regulatory framework emerged in and around 2023.

64. For example, on November 6, 2020, CMS issued instructions pertaining to claims for interrupted SNF stays and claims that contained both covered and non-covered days—only to then rescind and replace those instructions on January 14, 2021, effective April 1, 2021. Varghese Dec. Ex. I.

65. CMS issued an omnibus update, known as Transmittal 10880, on August 6, 2021, that made corrections and clarifications across Medicare Part A billing procedures for SNFs and included cross-references to PDPM instructions, rate components, and interrupted stay policy. Varghese Dec. Ex. J. CMS characterized these as corrections to "errors and omissions."

66. Transmittal 10880 was not labeled as a PDPM-specific directive, but it nevertheless introduced corrections, revisions, and adjustments to key sections of the SNF manuals relevant to PDPM, including revisions to coverage descriptions, billing rules, and longstanding manual text governing SNF services. In other words, Transmittal 10880 was part of the broader pattern of post-implementation cleanup, error-correction, and mid-stream reinterpretation that characterized CMS's rollout of the PDPM system.

67. CMS issued yet another update, Transmittal 11102, on November 10, 2021, that was part of its ongoing effort to address billing problems that surfaced after PDPM's implementation. Varghese Dec. Ex. K.

68. CMS subsequently reassessed and updated that guidance ***yet again***, rescinding and replacing those instructions in February 2022 with Transmittal 11256. Varghese Dec. Ex. L.

69. In October 2023—nearly two years after the cutoff of OIG's audit period and more than a year after OIG began conducting the audit—CMS finally issued Revision 12283 to the Medicare Claims Processing Manual. Varghese Dec. Ex. N. This revision formally incorporated the updates from Transmittal 10880 into the governing text.

70. Transmittal 10880 and the 2023 Manual revisions make clear that CMS was aware of critical deficiencies in its initial PDPM guidance and was still struggling to correct those failings years after the COVID public health emergency began.

71. This pattern of revisions, corrections, rescissions, and back-and-forth makes clear that the regulatory framework that OIG ultimately applied to the audit did not exist in 2020 and 2021 and amounts to a retroactive application of the law. Pinnacle remained in compliance with the actual rules that were in effect throughout the audit period.

72. PDPM was not governed by a stable or settled set of billing rules in 2020 and 2021. CMS was actively engaged in correcting omissions, revising guidance, and updating instructions years after the claims at issue in the audit were submitted. Despite CMS's attempts to gloss over material changes as "corrections," "clarifications," or "technical updates," the historical reality is clear: rather than evaluating audited claims in light of the ever-changing rules actually in effect during the audit period, OIG retroactively assessed Pinnacle using rules that simply did not exist at the time the services were rendered and the claims were submitted. This retroactive application of the law is a violation of Pinnacle's fundamental due process rights.

**COVID-19 strikes New York**

73. Meanwhile, as the early rollout of PDPM was proving to be a debacle, and CMS was embarking on what would prove to be a years' long process of trying to fix it, the COVID-19 pandemic struck the United States.

74. On January 21, 2020, the Centers for Disease Control and Prevention ("CDC") announced the first confirmed case of COVID-19 in the United States.

75. On January 31, 2020, then-Secretary of HHS Alex Azar declared a public health emergency under the Public Health Service Act.

76. On March 4, 2020, CMS instructed that SNF residents with mild COVID symptoms did "not require transfer to a hospital as long as the facility can follow the infection prevention and control practices recommended by CDC." Varghese Dec. Ex. C.

77. CMS further instructed that SNFs could accept a resident "diagnosed with COVID-19 and still under Transmissions-Based Precautions for COVID-19 as long as the facility can follow CDC guidance for Transmission-Based Precautions. . . . Nursing homes should admit any individuals that they would normally admit to their facility, including individuals from hospitals where a case of COVID-19 was/is present."

78. In early March 2020, New York City became the epicenter of the COVID-19 outbreak in the United States. Hospitals throughout the five boroughs were overwhelmed as patient volumes spiked, emergency rooms overflowed, and medical facilities converted conference centers, parking lots, and public venues into temporary treatment sites in a desperate attempt to expand capacity. Supplies of ventilators, oxygen, and personal protective equipment ("PPE") rapidly dwindled.

79. On March 7, 2020, New York State Governor Andrew Cuomo declared a COVID-19 disaster emergency.

80. On March 13, 2020, President Trump declared a national emergency under the National Emergencies Act and the Robert T. Stafford Disaster Relief and Emergency Assistance Act.

81. Pinnacle was at the epicenter of COVID-19 in New York City. Pinnacle staff were beginning to learn the new PDPM system when the pandemic hit.

82. No borough experienced the brunt of this crisis more directly than the Bronx. By April 2020, the Bronx recorded the highest hospitalization and death rates in New York City. The combination of dense housing, reliance on public transportation, and the concentration of essential workers accelerated transmission. These demographic and socioeconomic factors placed extraordinary pressures on all healthcare providers in the borough, including Pinnacle, the largest SNF in the Bronx.

83. In early March 2020, the city of New Rochelle, mere miles north of Co-op City, became one of the first major COVID-19 clusters in the United States. After a local resident tested positive and sparked widespread community transmission, New York State declared a formal "containment zone" around New Rochelle.

84. Community transmission rapidly descended on nearby Bronx neighborhoods. Once the virus entered the Bronx, the borough's structural vulnerabilities with crowded housing, essential-worker households, chronic illness rates, and multigenerational living, accelerated the spread dramatically.

85. SNFs, including Pinnacle, were left to try to find their way around a completely new PDPM claims system while also trying to navigate the worst public health crisis in at least a century.

86. At a broad level, SNFs were instructed by both state and federal authorities to preserve hospital capacity, take in COVID-positive discharges from hospitals, and provide life-saving care under emergency staffing conditions with limited access to PPE.

87. SNFs faced uncertainty and instability on another front, too: on top of the new PDPM regime, federal and state guidance on emergency procedures to address COVID came quickly and changed frequently.

88. Responding to the rapidly escalating crisis, federal and state authorities issued numerous emergency declarations and unprecedented directives.

89. In the first six months of 2020, federal and state officials issued dozens of COVID-related guidance documents relevant to nursing homes.

**<u>New York State issues EO 202.10 and other guidance to nursing facilities</u>**

90. On March 21, 2020, the New York State Department of Health ("NYS DOH") issued guidance advising nursing homes that "[r]ecent testing of residents and healthcare workers (HCWs) of nursing home and adult care facilities . . . has revealed that symptoms of influenza-like illness are very often determined to be COVID-19 in facilities located in areas with sustained community transmission." Varghese Dec. Ex. D. As a result, NYS DOH advised, any acute respiratory illness accompanied by a fever should be presumed to be COVID, and testing was no longer necessary to confirm.

91. While this guidance was intended to preserve COVID tests, which were in extremely short supply and not readily available at the time, it also made it nearly impossible for

Pinnacle to identify and isolate the residents who were infected from those who were not, increasing the chaos and the need for skilled nursing services.

92. On March 23, 2020, the Governor of the State of New York issued Executive Order 202.10 ("EO 202.10") in response to the COVID public health emergency. Varghese Dec. Ex. E. EO 202.10 modified or suspended numerous state statutory and regulatory provisions, including recordkeeping and diagnostic coding requirements. Notably, EO 202.10 provided:

> Notwithstanding any law or regulation to the contrary, *health care providers are **relieved of recordkeeping requirements** to the extent necessary for health care providers to perform tasks as may be necessary to respond to the COVID-19 outbreak, including, but not limited to, requirements to maintain medical records that accurately reflect the evaluation and treatment of patients, or requirements to assign diagnostic codes or to create or maintain other records for billing purposes. **Any person acting reasonably and in good faith under this provision shall be afforded absolute immunity from liability for any failure to comply with any recordkeeping requirement.*** In order to protect from liability any person acting reasonably and in good faith under this provision, requirements to maintain medical records under Subdivision 32 of Section 6530 of the Education Law, Paragraph (3) of Subdivision (a) of Section 29.2 of Title 8 of the NYCRR and Sections 58-1.11, 405.10, and 415.22 of Title 10 of the NYCRR, or any other such laws or regulations are suspended or modified to the extent necessary for health care providers to perform tasks as may be necessary to respond to the COVID-19 outbreak.

(emphases added).

93. EO 202.10 was mandatory, and all New York healthcare workers were legally required to comply with it. This was New York's "People Over Paperwork" mandate.

94. On March 25, 2020, NYS DOH issued guidance that "[n]o resident shall be denied re-admission or admission to the nursing home solely based on a confirmed or suspected diagnosis of COVID-19. Nursing homes are prohibited from requiring a hospitalized resident who is determined medically stable to be tested for COVID-19 prior to admission or re-admission." Varghese Dec. Ex. F.

**CMS explicitly directs SNFs to prioritize "patients over paperwork"**

95. While the stream of everchanging and conflicting PDPM guidance coming from CMS made it more difficult for Pinnacle to provide care during COVID, CMS did provide help to SNFs in another form.

96. Section 1135 of the Social Security Act, 42 U.S.C. § 1320b-5, permits the HHS Secretary to temporarily waive or modify certain Medicare requirements in response to a declared PHE. The Secretary, through CMS, did exactly that in response to COVID.

97. On March 28, 2020, CMS issued a bulletin titled "Long Term Care Facilities (Skilled Nursing Facilities and/or Nursing Facilities): CMS Flexibilities to Fight COVID-19." Varghese Dec. Ex. G. The document described "an unprecedented array of temporary regulatory waivers and new rules to equip the American healthcare system with maximum flexibility to respond to the 2019 Novel Coronavirus (COVID-19) pandemic." The goals of these modifications were designed to "*put* ***Patients Over Paperwork*** *to give temporary relief from many paperwork, reporting and audit requirements so providers, health care facilities . . . and States can focus on providing needed care to Medicare and Medicaid beneficiaries affected by COVID-19*." (emphasis added).

98. These waivers were intended to assist facilities suffering pandemic-related staffing shortages by prioritizing patient care over administrative paperwork formalities.

99. CMS also waived other requirements in response to the COVID PHE.

100. CMS waived certain requirements under 42 CFR §§ 483.10, 483.15, and 483.21 to allow freer transfer of residents within and between long-term care facilities and separation of residents with and without COVID.

101. CMS exercised authority pursuant to Section 1812(f) of the Social Security Act to waive the requirement that a three-day hospital stay precede a stay at an SNF in order for Medicare to cover the SNF stay. Thus, many residents came to Pinnacle without prior hospitalization and, therefore, without hospital records.

102. Moreover, CMS also waived paperwork requirements for hospitals, meaning that even patients who did come to Pinnacle following a hospital stay did not bring with them all the paperwork that ordinarily would have accompanied such a transfer.

103. CMS waived the requirements of 42 CFR § 483.20 to provide relief to SNFs on the timeframe requirements for MDS assessments and transmission.

104. CMS communicated its guidance to SNFs directly and through defendant NGS.

105. The Section 1135 waivers remained in effect until the COVID-19 PHE ended on May 11, 2023, nearly a year and half beyond the end of the OIG audit period.

**HHS directs providers to comply with the PREP Act**

106. Separately, HHS also directed providers to comply with the PREP Act.

107. As relevant here, the PREP Act, 42 U.S.C. § 247d-6d, provided certain civil immunity for the administration or use of covered COVID-19 countermeasures during the pandemic.

108. The HHS Office of General Counsel ("HHS OGC") issued Advisory Opinions regarding PREP Act Immunity during the pandemic, including an opinion that health care practitioners must follow the directives of the "Authority Having Jurisdiction" in order to qualify for PREP Act immunity. HHS OGC made clear that the "Authority Having Jurisdiction" included state public-health authorities like NYS DOH. HHS OGC Advisory Opinion 20-04 expressly states

that covered persons and program planners must act "in accordance with the public-health and medical response of the Authority Having Jurisdiction." Varghese Dec. Ex. H.

109. In other words, HHS recognized that a state public-health authority or the Governor under state emergency powers had the authority to issue directives about how care should be organized or delivered during the COVID PHE, and that compliance with such directives was *required* to obtain PREP Act coverage, except to the extent such state laws would directly conflict with the PREP Act.

110. Thus, compliance with New York State EO 202.10—including the instruction to prioritize patient care over papers—was not merely consistent with PREP Act immunity, it was required, according to the HHS OGC.

111. All of these federal directives had the effect of specifically instructing healthcare workers, including those at SNFs, to prioritize patients care and saving lives over compliance with the administrative policies that would apply under ordinary circumstances. Pinnacle complied.

**<u>Pinnacle's COVID response</u>**

112. Pinnacle was directly in the path of this first major COVID outbreak in the United States. The facility drew its residents and staff from communities experiencing the earliest and deadliest spread of COVID-19, and Pinnacle's residents, like the Bronx community from which many came, had some of the highest co-morbidities across the nation.

113. The situation at Pinnacle during COVID was dire. During March and April 2020, Mathew Varghese, CEO of Pinnacle, repeatedly contacted state and federal officials, including Seema Verma, the CMS Administrator at the time, then New York Governor Andrew Cuomo, and representatives of NYS DOH, HHS, and the Federal Emergency Management Agency, urgently

requesting help procuring PPE, including N95 masks, gloves, isolation gowns, alcohol pads, and face shields.

114. Throughout these unprecedented challenges, clinical decision-making at Pinnacle was driven by the urgent goal of saving lives and maintaining patient and staff safety in the midst of evolving knowledge about COVID and rapidly changing guidance from public health authorities. Pinnacle's life-saving efforts and results were nothing short of miraculous.

115. The pandemic caused capacity problems in hospitals throughout New York City. Providing skilled nursing services in place (*i.e.*, to Pinnacle residents at Pinnacle rather than transferring them to a hospital) addressed the emerging skilled care needs of patients without tying up hospital resources or exposing patients to COVID unnecessarily. Most hospitals in New York City at the time were at capacity and prioritizing the creation of ventilator units and could not care for Pinnacle residents.

116. In line with DOH and CMS guidance, Pinnacle provided skilled nursing services to its residents at the facility rather than transferring residents to the already overburdened hospitals. The skilled, lifesaving treatments that Pinnacle provided to its residents in direct response to COVID included administration of IV fluids, respiratory therapy and treatment, antibiotics, blood thinners, nursing assessment and observation, and rehabilitation services. Pinnacle essentially became a hospital for its residents.

117. New York State mandated that SNF residents be vaccinated for COVID. Vaccination of this population required close monitoring of residents, as SNF residents had higher odds of adverse vaccine effects given their age and comorbidities.

118. Skilled services performed by nursing staff, medical staff, and therapists could not be performed by nonskilled personnel. For example, nursing and medical staff had the skills,

knowledge, and judgment to identify early signs and symptoms of COVID and its effects on each resident considering the resident's risk factors, age, ethnicity, co-morbidities, circulatory deficiencies, and current medications, as well as psychological and mental wellbeing. All these services were conducted to maintain each patient's current condition or prevent further deterioration. Skilled services that were performed included IV fluids, respiratory therapy and treatment, antibiotics, blood thinners, nursing assessment and observation, and rehabilitation services.

119. As shortages in licensed nursing staff reached critical levels and nurses were furloughed under State mandated guidelines, patient care remained Pinnacle's priority.

120. To prioritize patient care under crisis conditions during this period, Pinnacle moved to document patients' conditions through charting by exception, a widely recognized emergency documentation method that reduces redundant charting so staff can devote time directly to patient care. Charting by exception cuts down on charting redundancy and increased the time nurses were spending directly caring for patients.

121. Charting by exception afforded Pinnacle's nursing staff the opportunity to determine how best to use their time and allowed residents to receive the best care possible as their conditions changed.

122. Evidence of skilled observation and treatment performed during 2020 and 2021 was documented throughout patients' charts. Care plans, progress notes, nurses' aide accountability forms, medication administration records, and therapeutic administration records all support the skilled services that Pinnacle provided to its residents.

123. Consistent with state and federal directives to put patients over paperwork, charting by exception allowed Pinnacle to save lives, at the extremely modest expense of some of the documentation that might have been produced under normal circumstances.

124. Pinnacle prioritized patients over paperwork and it saved lives. Ultimately, Pinnacle experienced substantially fewer COVID-19 deaths than many comparable Bronx skilled nursing facilities, reflecting strong infection control measures and clinical oversight.

**Subsequent Pandemic Waves and Their Impact on New York City and the Bronx**

125. By mid-March 2020, during what became the first wave of the pandemic, New York City's cases of COVID-19 were increasing exponentially. By March 29, the city had surpassed 30,000 confirmed infections and had become the worst-affected area in the United States.

126. April 2020 marked the peak of the first wave, with more than 12,000 new cases recorded statewide in a single day, overwhelming hospitals and causing more than 20,000 deaths in excess of what would be predicted under normal circumstances that month. The Bronx experienced some of the city's highest hospitalization and death rates over the course of the pandemic, driven by dense housing, crowded transit, and high burdens of chronic disease.

127. Pinnacle faced challenges from recurring COVID waves throughout the audit period and beyond.

128. Following a temporary decrease, by October 2020, infections began rising again.

129. From November to December 2020, citywide positivity exceeded 2.5 percent, prompting renewed limitations on gatherings, indoor dining, and gyms. The Bronx again recorded higher positivity and hospitalization rates than the city average, reflecting persistent healthcare access challenges and essential-worker exposure.

130. A winter surge driven by the COVID 19 Alpha variant pushed case counts upward in January and February 2021, even as early vaccination efforts began in long-term care facilities in late December 2020.

131. By March 2021, positive tests began to decline as vaccinations expanded; however, the Bronx lagged behind other boroughs in early vaccine uptake, contributing to comparatively higher hospitalization rates.

132. The COVID 19 Delta variant became dominant in New York City by July 2021, with the city reporting a 32 percent week-over-week increase in cases on July 23, 2021.

133. Between August and October, New York City reinstated indoor mask recommendations and expanded vaccine mandates. During this period, the Bronx again exhibited higher positivity and hospitalization rates than the city average.

134. In December 2021, the COVID 19 Omicron variant caused a dramatic spike in cases across New York State and New York City, with record-high daily case counts and a corresponding uptick in hospitalizations through early 2022.

135. Beginning in Spring 2022, citywide COVID-19 cases and hospitalizations generally declined to lower levels, though intermittent subvariant-driven bumps occurred.

136. One such surge was recognized beginning in July 2022, when New York State and New York City in particular experienced a spike in COVID-19 cases related to an Omicron subvariant, resulting in a significant increase in hospitalizations throughout New York State, with at least half concentrated in New York City. The particular subvariant of Omicron was known to elude rapid test detection and more easily reinfect people, including those who had been vaccinated and boosted.

137. Meanwhile, throughout 2022 and 2023, the Bronx continued to show higher baseline positivity and hospitalization rates than other boroughs, patterns tied to persistent structural health and socioeconomic disparities. Notably, of the New York City boroughs, the Bronx experienced the highest hospitalization and death rate due to COVID-19 over the course of the pandemic.

138. Despite these extreme challenges, Pinnacle's efforts to provide exceptional care to its patients were an undeniable success. Pinnacle experienced fewer deaths and mortality than its counterpart SNFs, while maintaining a 97–99 percent occupancy rate throughout the worst of the pandemic.

139. According to data compiled by the New York State Department of Health through February 28, 2023, there were 430 confirmed COVID deaths in Bronx County at nursing homes.

140. **Only two of these deaths, or less than one-half of 1 percent of county-wide COVID deaths, occurred at Pinnacle**.

141. Indeed, so successful was Pinnacle's treatment of its extremely vulnerable resident population that New York State officials briefly investigated Pinnacle's mortality data in May 2020 due to its surprisingly low death count before ultimately confirming that the facility's reporting was accurate.

142. An investigator from the New York Attorney General's Medicaid Fraud Control Unit told Pinnacle's CEO, Mr. Varghese, that Pinnacle performed better than most nursing homes in the area in terms of limiting COVID-related mortality and asked what Pinnacle was doing differently.

143. In response, Mr. Varghese emphasized that it strictly adhered to DOH, CDC, and CMS guidance. He outlined Pinnacle's early isolation protocols, infection control measures,

enhanced observation and assessment, timely physician involvement, early IV intervention when clinically indicated, antibiotic stewardship when appropriate, personal protective equipment utilization despite supply challenges, and continuous coordination with hospitals regarding testing and status updates.

**HHS and CMS try to rewrite history**

144. On or about July 1, 2022, around the time of the July 2022 Omicron subvariant surge, OIG began an audit of Medicare reimbursements paid to Pinnacle in 2020 and 2021.

145. From the moment OIG initiated the review, its posture toward Pinnacle was antagonistic.

146. In response to Mr. Varghese's question as to why OIG was auditing Pinnacle, OIG auditor Michael Guarnieri explained that Pinnacle was targeted for audit solely because it had billed the most Medicare claims of any nursing home in the nation during the period. In other words, the audit was driven not by any suspicion of wrongdoing but by the simple fact that Pinnacle had provided a large volume of care during the ongoing PHE. This was not unexpected, given that Pinnacle is one of the largest nursing homes in New York and was at the epicenter of the pandemic.

147. Mr. Varghese also asked Mr. Guarnieri about education and guidance, only to have his legitimate concerns abruptly dismissed. OIG made clear it had no interest in assisting the facility with compliance.

148. Pinnacle always intended to provide, and did provide, the documentation OIG requested, notwithstanding the challenges presented by the Omicron subvariant surge and repeated delays and issues on OIG's part with respect to its audit request. Pinnacle never gave any indication that its cooperation would be anything other than complete.

149. Responding to the OIG audit request required Pinnacle to devote significant manpower to print many thousands of pages of documents, review them, organize them, scan them, and upload them in the format required by OIG.

150. As Pinnacle was preparing the responsive documents, while simultaneously trying to manage the COVID surge severely affecting the facility, it requested a short extension from OIG to get it the thousands of pages of documents it had requested.

151. OIG not only rebuffed Mr. Varghese's reasonable request for an extension due to patient care concerns, it made an unprovoked threat to deem Pinnacle out of compliance with Medicare requirements if Pinnacle did not hastily provide the documentation OIG demanded. Such a finding would unquestionably have led to the facility's inability to continue operating and caring for its residents in the midst of the pandemic.

152. Later, Mr. Varghese offered to supply additional documentation and information to OIG as part of the audit, because he knew from past experience that CMS auditors would typically request such additional documentation for their review. But OIG rejected this offer outright.

153. The message was clear: OIG was looking for reasons to retroactively deny reimbursements and had no interest in affording Pinnacle a fair process that would allow Pinnacle to present evidence in support of its claims.

154. While the OIG audit was in progress, on June 8, 2023, CMS launched a nationwide initiative called the "5-Claim Probe and Educate Review," which CMS said was "intended to educate providers on correct billing practices under the PDPM." Varghese Dec. Ex. M.

155. Under this program, each MAC would select five claims from every SNF and review them for accuracy, documentation quality, and correct billing practices.

156. CMS introduced this process in recognition of "misunderstanding by SNFs about how to bill appropriately given the change from the Resource Utilization Group (RUG) IV to the PDPM (patient driven payment model) for claims with dates of service on or after October 1, 2019." *See* https://www.cms.gov/data-research/monitoring-programs/medicare-fee-service-compliance-programs/medical-review-and-education/skilled-nursing-facility-5-claim-probe-and-educate-review.

157. CMS specifically excluded COVID cases from this initiative. It directed: "Claims including the COVID-19 diagnosis for dates of service during the PHE are excluded, when possible. Your MAC will apply any relevant flexibilities and waivers if reviewing claims for dates of service from March 1, 2020 - May 11, 2023." Varghese Dec. Ex. M.

158. After reviewing each facility's five selected claims, each MAC was mandated to send each SNF an individualized results letter, providing individual PDPM education to each facility. The letter was to outline any documentation or coding issues found at the particular facility and offer one-on-one education to help the facility correct those errors going forward.

159. But Pinnacle was never given the opportunity to participate in this education initiative.

160. Instead, on July 16, 2025, OIG issued a Draft Audit Report, A-02-22-01017, regarding its audit of Pinnacle's Medicare Part A reimbursements for 2020 and 2021 that ignored the educational directive of CMS regarding PDPM audits and the educational opportunities provided to other facilities, which included instructions to exclude claims involving COVID-19 and to take into account the flexibilities and waivers issued during the PHE.

161. On September 15, 2025, counsel for Pinnacle submitted a reply to the draft report, stating "Pinnacle disagrees with all of the findings," and responding in detail to the numerous shortcomings in the draft report.

162. On November 14, 2025, nearly three and half years after commencing the audit, OIG issued its final report, Report Number A-02-22-01017, titled "Nearly All Skilled Nursing Services Provided by Pinnacle Multicare Nursing and Rehabilitation Center Did Not Meet Medicare Payment Requirements" (the "OIG Report"). Varghese Dec. Ex. O. The OIG Report claimed that "Pinnacle did not comply with Medicare requirements for 99 of 100 sampled claims, resulting in overpayments totaling $1.1 million, for skilled nursing services provided during calendar years 2020 and 2021." Based on statistical extrapolation from the audited sample, OIG declared, "[W]e estimate that Pinnacle received Medicare overpayments of at least $31.2 million."

163. The report went on to "recommend" that Pinnacle "refund to the Medicare program $31,227,884 for skilled nursing services claims that did not meet Medicare requirements." Notably, the report expressed that "OIG audit recommendations do not represent final determinations" and are not binding. Instead, the report noted, "CMS, acting through a Medicare contractor, will determine whether overpayments exist and will recoup any overpayments consistent with its policies and procedures."

164. A mere 75 days later on January 29, 2026, CMS, through NGS, sent Pinnacle the Demand Letter, demanding repayment of $31,227,884 no later than February 27, 2026. Varghese Dec. Ex. P. The letter contained no information about specific claims or the reasons they were denied. Instead, the Demand Letter included an enclosure titled "How This Overpayment Was Determined," which consists of a chart containing a single row (identifying the report number of the OIG Report, the audit period, the aggregate total of the alleged overpayment, and the

recoupment date) and the sentence "Reason for Overpayment: During one of its audits, the Office of the Inspector General identified a claim(s) for which you were overpaid." The Demand Letter contained no other information to support the allegation that Pinnacle received a $31 million overpayment.

165. The letter contains no indication that CMS or NGS independently reviewed the OIG Report.

166. NGS provided no identification of the claims it deemed overpaid, no explanation of why those claims were allegedly in error, no citation to any statutory or regulatory authority relied upon, and no description of the methodology used to calculate the recoupment amount.

167. Given the size and complexity of the OIG audit, and its use of extrapolation to arrive at the final conclusion, it is simply not possible that 75 days was sufficient time for CMS or NGS to independently review, verify, or evaluate an audit that took 1,233 days to complete in the first instance. Instead, CMS and NGS simply rubber-stamped OIG's flawed assertions.

168. Notably, there is an inherent conflict of interest in play between OIG and NGS. NGS had a responsibility to independently assess the OIG audit before adopting its findings. However, in other contexts, NGS is itself subject to OIG audit and oversight for its own role in Medicare claims administration. Thus, NGS had a clear incentive to "play nice" by simply adopting the OIG Report wholesale, rather than disagreeing with OIG's findings or methodology and generating friction between the two entities.

169. On February 11, 2026, Pinnacle timely submitted a statement of rebuttal pursuant to 42 CFR § 405.375 explaining why NGS's demand letter is legally insufficient and invalid, and explaining that CMS should suspend its request for recoupment pending final resolution of the matter (the "Rebuttal"). Varghese Dec. Ex. Q.

170. The Rebuttal noted that the Demand Letter from NGS and CMS provided nothing more than a conclusory, lump-sum overpayment amount lifted wholesale from the OIG's audit recommendation, without identifying a single claim, error finding, governing authority, or element of the alleged extrapolation methodology.

171. The Rebuttal went on to note that CMS and its contractors, including NGS, are expressly required under 42 C.F.R. § 405.921(b)(2) to identify the claims at issue, state the actual basis for each overpayment determination, and include all applicable reason and error codes. The Demand Letter included none of that information and is therefore deficient notice.

172. By a letter dated February 25, 2026, CMS and NGS responded to Pinnacle's detailed Rebuttal of the Demand Letter, ignoring Pinnacle's substantive arguments and stating tersely: "NGS Has received your request for Rebuttal. The rebuttal request does not cease recoupment activities in this circumstance. If you wish to stop recoupments on the debts, please continue with your Appeal or request an ERS as indicated in your demand letter." Varghese Dec. Ex. R.

**<u>The Administrative Review Process Has Compounded Existing Errors and Has Not Provided Meaningful Review</u>**

173. On February 25, 2026, Pinnacle timely submitted its request for Redetermination, the first level of administrative appeal. The submission was so voluminous that it was sent via FedEx on a thumb drive to NGS in Indianapolis as it could not be uploaded digitally.

174. Each of the 99 sampled claims that were reviewed was addressed in turn by Pinnacle with detailed rebuttals that included specific citations to sections of the clinical record as well as relevant regulations and other support. Each submission contained the following parts: the applicable Redetermination Request and Appointment of Representative forms, the January 29, 2026 initial demand letter issued by CMS/NGS, detailed clinical rebuttals setting forth the relevant

patient background, identifying the principal areas of dispute with exhibits, and explaining the errors in the OIG's underlying review and determinations with extensive supporting documentation, including patient medical records, applicable CMS guidance, and materials previously provided to the OIG. Collectively, Plaintiff submitted more than 97,000 pages of materials in support of its Requests for Redetermination.

175. Throughout the month of April 2026, Pinnacle noticed that various versions of the Redetermination Appeal Decision were uploaded into the Wellpoint Provider Portal and then removed.

176. On April 17, 2026, NGS issued a Redetermination Appeal Decision which was sent to counsel.

177. Between April 17 and May 14, various versions were uploaded and removed again within the Provider Portal. The multiple versions and conflicting dates prevented Pinnacle from determining which notice triggered the 60-calendar-day period for requesting reconsideration.

178. On May 14, 2026, NGS issued a *corrected* Redetermination Appeal Decision ("Corrected Redetermination Decision") with the following explanation: "This is a correction of the prior Medicare Redetermination Notice dated May 11, 2026. The decision has not changed. This Redetermination notice is being reissued to amend the Explanation of the Decision sections on the beneficiary addendum letters for E.D., J.P. and N.W."

179. This reference to "May 11, 2026" cannot be reconciled with the administrative record available to Pinnacle as the May 11 decision was uploaded into the Provider Portal and promptly disappeared. It was never mailed, served, or otherwise transmitted to counsel.

180. The Corrected Redetermination Decision dated May 14, 2026, contains a summary chart listing each beneficiary's name, the claims and dates of service, and the disposition. Each

disposition was either "partially favorable" or "unfavorable"; none was fully favorable. Following the chart is an incomplete explanation of the clinical rationale for each beneficiary. At the end of the document is a section titled "ISSUE: Validity of Statistical Sampling Methodology" which purports to uphold the extrapolation but is lacking in detail needed by Pinnacle's extrapolation expert to be able to reproduce or test the extrapolation independently. The decision also described the procedure for seeking second-level review—reconsideration before a Qualified Independent Contractor ("QIC").

181. Both the April 17 and May 14 Redetermination Decisions are characterized as "partially favorable" at the beginning of the letters.

182. Noticeably absent from the Corrected Redetermination Decision is an explanation for how the "partially favorable" decisions affected the dollar value of each claim. Without this information, Pinnacle could not adequately reconstruct the extrapolation, nor could it properly rebut the portions remaining denied for the "partially favorable" claims at Reconsideration.

183. On June 5, 2026, NGS, then operating as Wellpoint Federal, issued a Revised Demand Letter. The Revised Demand Letter stated: "This letter is in reference to the Medicare partially favorable redetermination decision, dated 06/01/2026, for the overpayment of $31,227,884 issued to you on 01/29/2026. Based on the partially favorable decision, the balance on the Principal amount is $30,763,816 and the Interest amount is $1,192,097.88. A payment is due totaling $31,955,913.88 by 07/04/2026." The letter also included information about the timing to file the second level Reconsideration Appeal to avoid immediate recoupment. The reference to June 1, 2026, is again confusing because Pinnacle never received a Redetermination Decision dated June 1, 2026, and the Government has taken the position that the May 14, 2026, Corrected Redetermination Decision controls.

184. Pinnacle could not understand why the amount of the recoupment was virtually unchanged despite 42 of the claims having a "partially favorable" decision. Although 42 of the 99 sampled claims—approximately 42.4%—received partially favorable determinations, the principal demand decreased by only $464,068, or approximately 1.49%, from $31,227,884 to $30,763,816. Accrued interest of $1,192,097.88 then increased the total amount demanded to $31,955,913.88, which was $728,029.88 more than the original principal demand. Neither the Corrected Redetermination Decision nor the Revised Demand Letter explained how the partially favorable determinations affected the value of the individual claims or how those adjustments were incorporated into the revised extrapolation. Based on the limited information available, Pinnacle's statistician estimated that the reduction in principal appeared to reflect only one small adjustment to one sampled claim, further demonstrating the need for the underlying claim-level data and extrapolation calculations.

185. Due to this discrepancy, counsel requested by letter on June 16, 2026, more detailed claim-level information from the Government and the information needed to recreate the extrapolation. Specifically, Pinnacle requested itemized overpayment details for the sample as adjusted after Redetermination.

186. The Government supplied a spreadsheet on July 15, 2026. Although the spreadsheet listed a "reimbursement after adjustment" amount for each claim, it did not identify how that amount was calculated, which claim lines had been allowed or denied, or what portion of each claim was partially favorable. Therefore, Pinnacle and its experts were unable to draw any definitive conclusions about what portions of the claims were affected. Pinnacle and its statistician remained unable to reconcile the claim-level adjustments with the revised extrapolated demand.

187. More troubling, comparison of the spreadsheet with the Corrected Redetermination Decision revealed 13 discrepancies. One was a cut-and-paste error concerning beneficiary E.B.: the clinical explanation for E.B.'s HIPPS-code determination was identical to the explanation for the beneficiary appearing immediately after E.B. in the decision. The remaining 12 discrepancies involved changes to the portions of sampled claims that were allowed or denied, including adverse findings concerning portions for which OIG had not found an error, which did not correspond with the clinical rationales or amounts shown in the spreadsheet. It appears Wellpoint Federal essentially rearranged the findings within those 12 claims but neither the Corrected Redetermination Decision nor the spreadsheet explains why the allowed and denied portions were changed or how those changes correspond to the revised amounts.

188. Due to the lack of detail in the spreadsheet, Pinnacle immediately notified the Government that more detailed claim-level information was necessary to adequately recreate and test the extrapolation. Federal law, a binding CMS Ruling, and CMS's own Program Integrity Manual require sufficient information to permit a meaningful challenge to the extrapolation. The Medicare Act requires the contractor to provide "a full review and explanation of the findings of the audit in a manner that is understandable to the provider." 42 U.S.C. § 1395ddd(f)(7)(B). HCFA Ruling 86-1 further requires that a provider be afforded a full opportunity to challenge the sampled claim determinations and the statistical basis of the projected overpayment. *See* HCFA Ruling 86-1, at 86-1-9 to 86-1-10. Consistent with those requirements, CMS's Medicare Program Integrity Manual requires documentation sufficient to recreate the sampling frame and sample and permit future replication or validation of the extrapolation. It also requires claim-level worksheets showing each step of the overpayment calculation, including the claim and line item, amount paid, audited value, amount overpaid, and reason for disallowance, as well as the actual overpayment or

underpayment attributable to each reviewed claim. *See* CMS, Medicare Program Integrity Manual, Pub. 100-08, ch. 8, §§ 8.4.3.2, 8.4.4.2, 8.4.4.4.1, 8.4.4.4.4, 8.4.4.5 & 8.4.7.1. By adopting the OIG's findings as the basis for a Medicare overpayment determination and seeking recovery of the extrapolated amount, NGS was required to provide sufficient information to permit Pinnacle to understand and meaningfully challenge that determination.

189. On July 22, 2026, Pinnacle provided the Government with a 14-page document identifying its specific questions concerning the 12 discrepant sampled claims and explaining in detail why the Corrected Redetermination Decision was deficient and unclear. The Government has not provided additional information about the 12 discrepant claims despite Pinnacle's requests. The failure to provide this additional information affected Pinnacle's ability to respond meaningfully at the Reconsideration stage. Specifically, Pinnacle's ability to defend portions of claims where the OIG had not previously found any errors was materially impaired in the time allotted to avoid immediate recoupment and without complete information related to these claims.

190. In a July 30, 2026, email, the Government acknowledged the cut-and-paste error but stated that it had not determined whether the error affected the extrapolation. Pinnacle continues to request the information necessary to test the extrapolation underlying the Revised Demand Letter, including information concerning beneficiary E.B., but the Government has not provided it. Pinnacle has specifically explained to the Government the nature of the spreadsheet used by the statistician and what is required to reconcile these issues but has not received the requested information.

191. The Government's failure to provide this information does not comply with the Medicare appeals regulations. An initial determination must disclose the basis for any full or partial denial and provide the applicable claim-adjustment and remark codes explaining the

determination. 42 C.F.R. § 405.921(b)(2). A redetermination affirming an initial determination in whole or in part must clearly state the extent to which the decision is favorable or unfavorable, summarize the relevant facts and evidence, explain the application of governing law and CMS policy, and provide a clear and understandable rationale for the decision. *Id.* § 405.956(b)(1)–(4). Here, merely characterizing 42 sampled claims as "partially favorable," without identifying the portions or claim lines allowed, the resulting overpayment for each claim, or how those changes affected the extrapolation, did not satisfy those requirements. Additionally, the admitted copying error and 12 additional discrepancies have not been explained despite Pinnacle's requests for clarification.

192. On July 31, 2026, Pinnacle timely submitted its Reconsideration Requests to the QIC, C2C Innovative Solutions, Inc. ("C2C"), which is the second level of administrative appeal. The submission was likewise so voluminous that it was sent via FedEx on a thumb drive to C2C in Jacksonville.

193. Pinnacle addressed each of the 99 sampled claims in turn in its reconsideration submission. The materials concerning each sampled claim included: the applicable Reconsideration Request and Appointment of Representative forms, the May 14, 2026, Corrected Redetermination Decision, a detailed written response rebutting the specific bases for denial with exhibits, together with supplemental documentation submitted to complete the administrative record and the materials previously submitted at the Redetermination stage. Plaintiff's second-level submissions included several hundred pages of additional supporting material for each appeal—more than 40,000 additional pages in the aggregate—such that Plaintiff submitted well in excess of 140,000 pages of substantive argument, medical documentation, CMS guidance, MAC

appeal decisions and other supporting materials during the first two levels of the Medicare administrative appeal process.

194. Pinnacle's rebuttals at both redetermination and reconsideration were prepared by experienced clinical professionals following a painstaking, claim-specific review of the relevant medical records, denial rationales, and supporting materials, and reflected their professional analysis of the clinical and coverage issues presented by each challenged claim. In at least one instance, NGS continued to find a sampled claim unfavorable based on a purportedly missing record even though Pinnacle had included that record, highlighted it, and separately identified it as an exhibit in its submission.

195. Despite Pinnacle's timely and comprehensive pursuit of each available level of administrative review, the process has not provided Pinnacle with a clear, consistent, or adequately supported determination of the alleged overpayment. Instead, the administrative process produced multiple versions of the decision, conflicting decision dates which gave rise to uncertainty concerning appeal and recoupment deadlines, an admitted cut-and-paste error, 12 additional unexplained discrepancies, and a revised extrapolated demand whose accuracy the Government will not confirm. Pinnacle was nevertheless required to proceed to reconsideration, under threat of recoupment, without the claim-level information necessary to understand the determination or meaningfully challenge it.

196. By requiring Pinnacle to appeal shifting and internally inconsistent determinations without adequate notice of the factual basis or a reliable explanation of the extrapolation, the Government has deprived Pinnacle of constitutionally adequate notice and a meaningful opportunity to be heard before recoupment of an amount equal to approximately two full years of Pinnacle's Medicare payments—an amount that would bankrupt Pinnacle.

197. As of the filing of this Amended Complaint, Pinnacle's request for reconsideration remains pending. Interest continues to accrue while Pinnacle pursues administrative review of a demand whose factual basis and statistical accuracy the Government has not adequately explained or confirmed. Rather than curing the deficiencies in the original determination, the administrative process has compounded them.

198. On July 27, 2026, Pinnacle advised the Court by letter of the developments in the administrative process, including the Government's incomplete production of claim-level and extrapolation information, the 13 identified discrepancies, and the resulting impairment of Pinnacle's ability to prepare its request for reconsideration. Pinnacle also requested a conference concerning those issues. The Court held a conference on August 17, 2026. By Order dated August 18, 2026, the Court granted Pinnacle leave to file an amended complaint, denied Defendants' then-pending motion to dismiss without prejudice as moot, and referred the action to the designated Magistrate Judge for general pretrial, settlement, and discovery matters.

199. Pinnacle is further prejudiced as it enters the next phase of administrative review because the missing claim-level and extrapolation data are necessary not only to prepare its statistical challenge, but also to ensure that the evidentiary record is complete. Although Pinnacle may seek to submit additional evidence at the OMHA level, evidence not submitted before issuance of the QIC's reconsideration may be excluded unless Pinnacle provides the required explanation and establishes good cause. *See* 42 C.F.R. §§ 405.966(b), 405.1018(c), 405.1028(a). The Government's continuing failure to provide information uniquely within its possession therefore forces Pinnacle to proceed without the evidence necessary to test the extrapolation and creates a substantial risk that the information will not be admitted or considered at the ALJ hearing.

It also deprives Pinnacle's experts of the information and time necessary to prepare a complete statistical challenge before recoupment may resume following the QIC's decision.

200. That prejudice extends beyond the ALJ hearing. After the ALJ issues a decision, the Medicare Appeals Council ordinarily limits its review to the evidence contained in the record of the OMHA proceedings. *See* 42 C.F.R. § 405.1122(a). Any subsequent judicial review likewise ordinarily proceeds on the administrative record rather than through the presentation of new evidence to the district court. Although narrow procedures exist for a remand to consider new and material evidence upon a showing of good cause, *see* 42 U.S.C. § 405(g), Pinnacle should not be forced to depend on those exceptional procedures merely because the Government failed to timely disclose the information necessary to evaluate its own extrapolation. Unless that information is produced in time to be submitted and considered during the OMHA proceedings, Pinnacle faces a substantial risk that neither the Appeals Council nor a federal court will ever review the merits of its challenge based on a complete evidentiary record.

**The OIG Report and the Demand Letter fail to provide constitutionally adequate notice**

201. The OIG Report is one-of-a-kind. It represents the first, and so far only, completed audit of a SNF ever conducted under the new PDPM system. It also represents a breathtaking attempt to rewrite history.

202. The OIG Report retroactively applies PDPM regulations that did not exist at the time the claims were submitted; ignores binding state and federal law issued in response to the COVID public health emergency; and was the product of a secretive audit process that failed to give Pinnacle reasonable notice of how the reviewers arrived at their conclusions.

203. The Demand Letter compounds those blatant constitutional violations by failing to provide Pinnacle any meaningful opportunity to be heard in response to the demand for recoupment before potentially being put out of business.

204. The Demand Letter was issued on January 29, 2026, a mere 75 days after OIG issued its final report. It is simply not plausible that CMS or NGS actually reviewed and evaluated the findings of the OIG Report, as they are required to do. They merely adopted them wholesale, in violation of their statutory mandate.

205. CMS literally admitted as much. In December 2025, between issuance of the OIG Report and the Demand Letter, CMS employees told counsel for Pinnacle that the audit was simply too big and complex for CMS to consider any arguments or reductions, and that CMS would instead simply move the process forward to NGS for recoupment in late December.

206. All of this is made worse by the obvious conflict of interest between OIG and NGS: here, NGS was supposed to independently decide whether to adopt the "recommended" findings of the OIG Report. Yet OIG also has audit and oversight power over NGS. NGS has a clear incentive to minimize any potential clashes with OIG at the expense of affording Pinnacle the due process it is entitled to receive.

207. On its face, the OIG Report clearly illustrates that the audit did not apply the law that was actually in effect at the time of the claims in 2020 and 2021.

208. The OIG Report alleges that "Data analytics indicated that Pinnacle had a significant increase in Medicare Part A reimbursement for skilled nursing services under the PDPM as compared to the prior RUG payment model." The OIG Report treats this observation as casting suspicion on Pinnacle, an implication that PDPM had somehow revealed that Pinnacle had improperly submitted reimbursement claims.

209. The OIG Report does not allege any fraud, nor does it claim that Pinnacle failed to provide the services for which it was reimbursed—just that with the benefit of hindsight Pinnacle should not have provided the care its health care providers deemed necessary, and that CMS should therefore not have to pay.

210. Nowhere does the OIG Report connect the obvious dots that the switch to PDPM and the audit period coincided with the height of COVID. Nowhere does the OIG Report even consider the possibility that any increase in reimbursement for skilled nursing services might be attributable to an increase in the need for, and actual provision of, skilled nursing services in response to COVID.

211. Unbelievably, nowhere does the OIG Report attempt to seriously address COVID-19, the Section 1135 waivers, or the People Over Paperwork mandate.

212. The OIG Report alleges that "Pinnacle did not comply with Medicare requirements for 99 out of 100 sampled claims."

213. This is, to put it plainly, ridiculous. A 99 percent error rate suggests a near-total, systemic failure. The reality and success of Pinnacle's operations during COVID do not bear that out. Two deaths during all of COVID is systemic success, not failure.

214. Rather than evincing some failure on Pinnacle's part to provide necessary services or to comply with submission requirements, the putative 99 percent error rate instead reveals that the OIG audit methodology fully and completely fails to account for the rules that were in place during the audit period.

215. Notably, the OIG Report contains no allegation that Pinnacle committed fraud or otherwise deliberately submitted non-reimbursable claims. Rather, according to OIG, Pinnacle simply did its paperwork wrong or provided medically unnecessary services 99 percent of the time.

216. This is not a credible conclusion. It springs entirely from CMS's misapplication of the law that was in place during the audit period, and from CMS's contract reviewers' failure to understand the regulatory framework and the clinical context in which services were delivered.

217. Both CMS and NYS DOH mandated SNFs to place patient care and outcomes above technical compliance with paperwork requirements. The specific Section 1135 waivers, State Executive Order, and NYS DOH guidance all confirmed and reinforced these directives. Pinnacle's reliance on these directives was reasonable, expected, and required.

218. The OIG Report and the Demand Letter fail to comport with due process in numerous ways.

**Failure to apply governing federal and state law**

219. The OIG Report and the Demand Letter ignore the binding, COVID-specific federal and state waivers and guidance that were in effect during the audit period.

220. Starting in March 2020, Federal and State authorities loosened many paperwork and reporting rules so that frontline healthcare providers could focus on caring for patients, not filling out forms and double-checking coding minutia. SNFs were required to take in COVID positive patients, work through severe staffing shortages, and rely on emergency flexibilities that were intentionally created to ease documentation burdens during the crisis.

221. CMS and NGS explicitly told providers that clinicians were to "Put Patients Over Paperwork" and that CMS was "temporarily eliminating paperwork requirements" so clinicians could focus on patient care rather than compliance formalities. Pinnacle took this directive to heart.

222. Pinnacle faced endless pressure as it admitted COVID positive hospital discharges, treated critically ill residents, and protected staff and patients despite limited PPE and constantly changing public health guidance.

223. Every decision was made with one priority in mind: saving lives. And Pinnacle did just that. Pinnacle had very few COVID-related deaths compared to the nursing homes that surround it precisely because it put "patients over paperwork". By ignoring these realities, CMS and NGS are now trying to penalize Pinnacle for following their directives.

224. The waivers and flexibilities put in place by CMS were intended to support this lifesaving work by easing administrative requirements that could impede emergency care.

225. The OIG Report and the Demand Letter treat those extraordinary times as if they were business as usual, disregarding the Patients Over Paperwork directives, the policies in effect during the COVID PHE and the extreme conditions under which Pinnacle operated. The Demand Letter is legally indefensible and cannot stand.

226. In essence, CMS and NGS are now demanding complete repayment for the tireless, round-the-clock efforts Pinnacle made to keep people alive. Pinnacle saved lives, complied with the law, and is now being penalized for it.

227. Incredibly, the Report not only ignores the COVID-era law, it ignores COVID itself. The only time the OIG Report even acknowledges the existence of COVID is to make a dismissive, conclusory statement that "[t]he audit report does not reference CMS's waiver provisions in place during the COVID-19 PHE because none of the deficiencies we identified were associated with these provisions." And OIG included this perfunctory statement in the final report only after counsel for Pinnacle raised these obvious material omissions in its response to OIG's draft report.

228. This conclusory dismissal is incompatible with the reality that CMS had explicitly suspended or modified significant Medicare documentation requirements during the audit period.

**<u>Retroactive application of law that did not exist at the time of the conduct</u>**

229. The OIG Report also impermissibly evaluated PDPM claims submitted during the audit period as though the relevant regulatory framework already existed in stable form at that time. It did not, and auditing the claims as though it did violates the basic due process requirement that Pinnacle have notice of the regulations that govern its conduct.

230. The OIG Report alleges that Pinnacle "incorrectly billed Medicare for skilled nursing services (1) when the medical record did not support that the associated individual was assigned the correct reimbursement rate code, (2) provided to individuals who did not require skilled nursing services, and (3) that did not meet documentation requirements."

231. Crucially, the OIG Report does not claim that Pinnacle failed to submit <u>any</u> documentation in support of its reimbursement claims. Rather, the OIG Report dives deep into the weeds of years-old medical documentation to quibble with the way a particular diagnoses or other patient developments were recorded—all while applying a regulatory framework that ***did not exist*** at the time.

232. OIG's conclusions rest in part on the premise that PDPM billing rules were fixed and fully operational throughout 2020–2021. As recounted in detail above, this is false. Instead, CMS repeatedly identified its failings on the fly, correcting earlier instructions and issuing superseding guidance as new problems emerged.

233. The second category of claims, in which OIG asserts that in 54 out of 100 cases Pinnacle provided skilled nursing services to individuals who did not need them, amounts to an impermissible retrospective second-guessing and overruling of the residents' primary care physician by the OIG reviewer or reviewers.

234. During this time, SNFs were also required to accept COVID-positive hospital discharges, operate under severe staffing shortages, and comply with rapidly changing state and federal infection-control mandates. In this environment, it would have been extremely difficult for Pinnacle or any other SNF to comply with a theoretical coherent and static set of PDPM submission and coding rules—let alone the constantly changing ones that CMS actually offered.

235. PDPM was not a fixed regulatory framework in 2020 and 2021. It was a constantly shifting set of operational instructions being corrected midstream, piecemeal, and often years after services were provided. Pinnacle was left to implement a brand new, radically different payment model amid an unprecedented public health emergency, without stable guidance and without adequate training.

236. Yet the OIG Report proceeds as if none of this occurred. It applies PDPM as though it were fully mature at the beginning of 2020, as though CMS's instructions had not been repeatedly rescinded and rewritten, and as though the Section 1135 waivers and state emergency orders did not fundamentally alter documentation expectations during the public health emergency.

**Refusal to provide adequate notice of reviewer credentials and methodology**

237. OIG also refused to disclose the qualifications of its reviewers—a fact the OIG Report freely admits.: "We acknowledge that we did not provide Pinnacle with curricula vitae of the medical review contractor employees."

238. This refusal to disclose the qualifications of the nurse or other clinical reviewers who performed the audit is a deprivation of due process.

239. The Report states that the audit was performed by "a Registered Nurse with 20 years' experience in coding skilled MDS Assessments, validating medical necessity, and performing medical reviews. Also, another reviewer was a physician who is licensed to practice

medicine, is knowledgeable in the treatment of enrollees' medical conditions, and is familiar with guidelines and protocols in the area of treatment reviewed."

240. Despite numerous requests, OIG refused to provide Pinnacle with the actual qualifications of the reviewers. It is impossible to evaluate whether these individuals were actually qualified to conduct the review and whether the process was fair.

241. This lack of specificity is particularly troubling in light of the timing of the switch to the PDPM system. OIG made it impossible to adequately assess the reviewers' experience and competence.

242. For example, OIG failed to specify how much experience, if any, the reviewers had working in SNFs and specifically SNFs during the pandemic. It failed to specify how much or what type of training the reviewers were given with respect to PDPM. At a minimum, the reviewers had the benefit of being able to rely on the final versions of the PDPM rules that CMS iterated and revised over the course of several years—including those rules that were not settled until after the audit period.

243. OIG also failed to explain *how* the reviewers supposedly took into account the myriad federal and state waivers that were in place at the time the services were provided. The OIG Report claims that OIG "worked closely with our independent medical review contractor to ensure that it considered all relevant waiver provisions in place during the audit period" before immediately concluding in a summary fashion that "[t]he audit report does not reference CMS's waiver provisions in place during the COVID-19 PHE because none of the deficiencies we identified were associated with these provisions." The OIG Report absurdly makes no further attempt to account for the Section 1135 waivers, and does not even mention the NYS DOH guidance that was relevant to Pinnacle's operations during the audit period.

244. OIG provided no further details on how these individuals conducted their review, failing to specify, for example, whether multiple reviewers independently reviewed each sample or whether one simply supervised another, whether the reviewers ever disagreed, and if so, how that disagreement was resolved, and so forth. OIG simply asserts without further support that the reviewers were qualified.

245. In short, OIG entrusted reviewers whose credentials and process cannot be fairly examined or rebutted with the decision to send Pinnacle a bill for more than $31 million. If allowed to stand, that decision would bankrupt Pinnacle, render its residents homeless, put hundreds of staff out of work, and deprive the community it serves of a critical component of the healthcare infrastructure.

246. It is also obvious that NGS and CMS simply adopted OIG's findings without making any independent review of the claims or reaching any determination of their own. The January 29, 2026, Demand Letter contains no explanation or reasoning to support the alleged overpayment of more than $31 million. Instead, the letter contains one line referring to the OIG report number. This is not sufficient notice of the basis of the recoupment demand for Pinnacle to be able to meaningfully respond.

**Duplicative audit by CMS for an overlapping period**

247. Finally, the OIG audit also included claim periods that overlapped with a 2022 audit conducted by CMS's Unified Program Integrity Contractor ("UPIC"), and involved some of the same beneficiaries whose claims were evaluated in the UPIC audit. UPIC's function is to "perform fraud, waste, and abuse detection, deterrence and prevention activities for Medicare and Medicaid claims."

248. A comparison of these two audits, both conducted under the auspices of HHS, shows the massive impact of OIG's failure to apply the law that was actually in effect during the OIG audit period.

249. UPIC conducted a medical review involving 27 claims for dates of service January 17, 2020, through May 31, 2021.

250. According to UPIC, it reopened these claims "based on credible evidence regarding data analysis findings, allegations regarding [Pinnacle's] billing practices, and/or medical review probe findings."

251. After reviewing the sample, CMS, acting through UPIC, sought to deny seven of the claims. Pinnacle ultimately prevailed on all but one.

252. The UPIC audit evaluated the claims in the context of the Section 1135 COVID waivers that were in effect during 2020 and 2021. And the UPIC audit was conducted in 2022, before CMS issued its later revisions to the Medicare Claims Processing Manual that consolidated and clarified the changing PDPM guidance.

253. Following the successful administrative appeals of the UPIC determinations, Pinnacle's final error rate was 3.7 percent (one claim out of 27).

254. OIG, on the other hand, conducted an audit that included claims from the same time period as the UPIC audit, but completely disregarded the COVID waivers and retroactively applied a PDPM framework that did not exist at the time the claims were submitted, to come to the patently absurd and contrary finding of a 99 percent error rate.

255. Moreover, the overlapping audit periods, and OIG's half-hearted attempt to deal with them, undermines the statistical validity of the OIG audit.

256. OIG eventually removed duplicative claims that already had been reviewed in the UPIC audit from the OIG audit population. Proper statistical practice dictates that OIG should then have redrawn a new random sample from the corrected population. It did not do so, instead relying on a post-hoc tweaking of the population. That renders the OIG sample impossible to replicate, in violation of basic statistical methodology and due process.

257. Pinnacle was already in the middle of collecting the documentation OIG requested at this point. As discussed above, the OIG audit began around the same time as the COVID-19 Omicron subvariant surge. OIG flatly refused Pinnacle's request for a modest extension of the deadline to supply OIG with the thousands of papers of documentation it demanded during the surge.

258. Under this extreme time pressure, and the threat that OIG would deem Pinnacle out of compliance with Medicare and therefore unable to continue operating, Pinnacle agreed under duress to allow OIG to make a post-hoc modification of the population to exclude the claims duplicated by the UPIC audit without redrawing a new random sample, which would have required Pinnacle to start over with its collection of the documents OIG demanded.

259. Pinnacle faced a choice: accept a statistically dubious sample from a population that was modified after the fact; or completely restart the process with a new sample and run the risk of missing OIG's onerous, inflexible deadline—and consequently, the risk of endangering Pinnacle's ability to operate.

260. While Pinnacle agreed under duress that OIG could audit the original sample, OIG never indicated—and Pinnacle certainly never agreed—that OIG would then use the sample as a basis to extrapolate an overpayment estimate.

261. The basis for Defendants' $31 million recoupment demand is a statistically invalid sample that Pinnacle never had notice would be used for extrapolation purposes. This failure to give Pinnacle notice of the process that would be used against it to demand recoupment violates the Fifth Amendment.

262. As early as 2015, the Government Accountability Office drew attention to the problem of duplicative and overlapping audits of Medicare claims. In response, HHS said that it would develop guidance for its contractors and work to ensure that there would not be duplicative, overly burdensome audits.

263. This obviously did not happen.

264. All of the foregoing amounts to a blatantly unconstitutional denial of due process leading to a demand that Pinnacle pay the government more than $31 million no later than February 27, 2026. The actions of HHS, CMS, OIG, and NGS with respect to the audit, the OIG Report, and the Demand Letter are irrational, oppressive, and arbitrary, and shock the conscience.

**<u>The Demand Letter fails to provide constitutionally adequate opportunity to be heard</u>**

265. The process that HHS, CMS, and NGS purport to impose for the demanded recoupment fails to provide constitutionally required pre-deprivation opportunity to be heard.

266. The Demand Letter requires immediate payment of more than $31 million no later than February 27, 2026.

267. In the event this amount is not repaid in full by that date, the interest on any unpaid amount begins accruing immediately, regardless of the status of any administrative appeal or judicial review.

268. In other words, the "process" the government purports to afford Pinnacle is to demand immediate payment of $31 million or charge Pinnacle nearly $10,000 ***per day***, even while Pinnacle contests the validity of the underlying deprivation.

269. The Demand Letter supplies only a summary conclusion and none of the required factual, methodological, or legal reasoning, and therefore failed to satisfy regulatory content requirements under 42 C.F.R. § 405.921(b)(2) and basic constitutional due process.

270. The wholesale omission of the required information from the Demand Letter violates constitutional due process principles, which require notice reasonably calculated to inform the provider of the case against it and provide a meaningful opportunity to respond before deprivation occurs.

271. The promise that an administrative law judge or a federal district court may eventually review the merits of the blatantly unconstitutional OIG Report—perhaps years later, while daily interest is accruing at an astronomical rate—is not constitutionally adequate opportunity to be heard given the immediate threat to Pinnacle's continued existence.

272. The OIG Report and the Demand Letter fail to afford basic due process protections, in terms of both adequate notice and opportunity to be heard, in myriad ways and should not be allowed to stand.

**The consequences of recoupment would be dire for Pinnacle**

273. The Demand Letter does not constitute a valid determination and cannot serve as a valid predicate for recoupment.

274. Immediate recoupment of more than $31 million would jeopardize Pinnacle's ability to maintain operations as an essential facility for the residents of the Bronx and surrounding communities.

275. Pinnacle plays a critical role in ensuring continuous access to long-term and post-acute care in the local and regional area.

276. Disrupting Pinnacle's financial stability would directly threaten the availability of medically necessary service to Medicare beneficiaries and create significant public-health and safety concerns and cause closure of Pinnacle.

277. Like many skilled nursing facilities, Pinnacle operates on thin financial margins.

278. CMS's demanded immediate repayment of more than $31 million threatens Pinnacle's financial solvency, and would lead to mass layoffs, forced resident discharges, significant reductions in bed capacity, and closure of the facility.

279. This would jeopardize Medicare beneficiary access and pose grave risks to the life and health of vulnerable Medicare beneficiaries.

280. Any recoupment, offset or withholding at this time would severely disrupt finances, impair staffing and operations, and place continuity of patient care in immediate jeopardy.

281. Pinnacle lacks the liquidity necessary to withstand such an abrupt loss of revenue. Any withholding would immediately undermine its ability to sustain essential clinical and operational functions.

282. Recoupment would disrupt critical vendor relationships including pharmacy, oxygen, medical supplies, and food service, creating cascading risks to resident care.

283. Recoupment would also force drastic workforce reductions and potentially reduce bed capacity or trigger closure.

284. These consequences would directly impair access to care for Medicare and Medicaid beneficiaries and are inconsistent with CMS's and NGS's obligation to consider beneficiary access and facility stability when making recoupment decisions.

285. A forced repayment of the alleged overpayment would therefore threaten Pinnacle's ongoing viability, placing residents at risk of displacement and compromising a key skilled nursing facility within a federally designated health professional shortage area.

286. The threat to Pinnacle residents is not an abstract one. Medical research on relocation stress syndrome or transfer trauma shows that moving SNF residents from one facility to another in the event of a facility closure is linked to worse resident outcomes, including higher mortality.

**<u>Defendants' "something for nothing" posture is contrary to public policy</u>**

287. Ultimately, Defendants got exactly the extraordinary, life-saving medical care that they, and everyone else, hoped for during the worst public health crisis in at least a century.

288. Pinnacle and its dedicated staff undertook remarkable efforts to save lives, often at profound personal risk, based on a promise that HHS, CMS, and NGS would stand behind them. The process of responding to COVID was supposed to be a cooperative one. Government regulators and frontline healthcare providers were all focused on one goal: saving lives. Through the Section 1135 waivers and other guidance, CMS gave Pinnacle and every other SNF the freedom they needed to prioritize "patients over paperwork." Pinnacle did exactly that, to near miraculous results, losing only two patients total to COVID over the course of more than three years.

289. CMS also directed SNFs to follow state law. New York State, in turn, told SNFs to prioritize saving lives over paperwork, even going so far as to grant "absolute immunity from liability" to providers for recordkeeping deficiencies.

290. It is only now, years later, that Defendants have decided to disavow their obligation to pay for the care they told Pinnacle to provide. It is only now that the lives have been saved that Defendants have decided they are entitled to something for nothing.

291. CMS does not—because it cannot—claim that Pinnacle did not actually provide the care at issue. There is no dispute that Pinnacle provided the care for every single claim at issue in the OIG Report.

292. Instead, CMS has simply decided, after having already realized the benefit of Pinnacle's exceptional track record of clinical outcomes, that it no longer wants to pay for that life-saving care.

293. Further, while enforcing a $31 million recoupment would almost certainly put Pinnacle out of business, when viewed in terms of the public benefit that money paid for, it is a bargain.

294. The audit period spans 2020 and 2021. This means CMS paid about $1.3 million on average per month. Pinnacle had an average of about 169 Medicare patients per month during the audit period.

295. In other words, CMS paid on average less than $7,700 per Medicare patient per month for Pinnacle to provide life-saving, skilled nursing care during the worst public health crisis in living memory. From the beginning of the COVID PHE through the end of February 2023 (more than a year after the end of the audit period), Pinnacle had only two deaths in total attributable to COVID.

296. The broader public policy implications of Defendants' recoupment demand are extremely troubling. What happens during the next public health emergency, when the government tells healthcare providers to prioritize patient care and not to focus on paperwork? If Defendants

are allowed to change the rules retroactively in this case, it undermines trust in the future. Providers watching Defendants' conduct here will learn the lesson that CMS is not to be trusted and that extraordinary efforts to save lives may ultimately result in nothing but a crushing demand for repayment. The chilling effect on patient care—and ultimately, on lives saved—is obvious.

297. The counterfactual in this case makes as much clear. Had Pinnacle not provided skilled nursing services to its residents, those residents would have been transferred to hospitals (in contravention of NYS DOH orders). That would have meant reduced hospital capacity for COVID patients, which would have led to more deaths. That is exactly what will happen in the future if Defendants are allowed to change the rules after the game is over.

## CAUSE OF ACTION I
**Deprivation of procedural due process – Retroactive application of law**
**(U.S. Const. amend. V)**

298. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

299. Pinnacle has a constitutionally protected property interest in the payments it receives under Medicare Part A for the skilled nursing services it provides.

300. CMS and NGS's demand for recoupment constitutes a deprivation of that property interest.

301. Defendants have failed to afford Pinnacle adequate procedural safeguards to protect its interest.

302. Defendants all arrived at or adopted the audit conclusions by relying on PDPM rules and regulations that were not in effect at the time the care was rendered and the claims were submitted.

303. Defendants all arrived at or adopted the audit conclusions by ignoring legally binding state and federal waivers, guidance, and orders that were in effect at the time the care was rendered and the claims were submitted.

304. The administrative review process, 42 C.F.R. § 405.904(a)(2), does not provide Plaintiff with adequate procedural protections.

305. Absent immediate equitable relief, Pinnacle will be unable to secure meaningful judicial review of CMS and NGS's demand for recoupment, because Pinnacle will no longer exist as a direct result of that demand for recoupment.

306. Plaintiff, its patients, medical professionals, and staff face imminent harm due to Defendants' failure to afford Plaintiff procedural due process.

307. Plaintiff has no adequate remedy at law and only the equitable relief requested in this complaint will remedy these harms.

**CAUSE OF ACTION II**
**Deprivation of procedural due process – Inadequate Notice of the Audit Process**
**(U.S. Const. amend. V)**

308. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

309. Pinnacle has a constitutionally protected property interest in the payments it receives under Medicare Part A for the skilled nursing services it provides.

310. CMS's demand for recoupment constitutes a deprivation of that property interest.

311. Defendants have failed to afford Pinnacle adequate procedural safeguards to protect its interest.

312. NGS and CMS uncritically adopted the findings of OIG's reviewers, whose qualifications and review procedures OIG refused to explain other than in the most general terms.

313. OIG rejected Pinnacle's detailed explanations of the audited cases without reason.

314. CMS and NGS's pro forma recoupment letter fails to provide constitutionally adequate notice of the basis for its recoupment decision and demand.

315. The administrative review process, 42 C.F.R. § 405.904(a)(2), does not provide Plaintiff with adequate procedural protections.

316. Absent immediate equitable relief, Pinnacle will be unable to secure meaningful judicial review of CMS and NGS's demand for recoupment, because Pinnacle will no longer exist. The demand for recoupment will put Pinnacle out of business long before the protracted administrative review process concludes.

317. Plaintiff, its patients, medical professionals, and staff face imminent harm due to Defendants' failure to afford Plaintiff procedural due process.

318. Plaintiff has no adequate remedy at law and only the equitable relief requested in this complaint will remedy these harms.

## CAUSE OF ACTION III

**Deprivation of procedural due process – Inadequate Opportunity to be Heard Prior to Recoupment (U.S. Const. amend. V)**

319. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

320. Pinnacle has a constitutionally protected property interest in the payments it receives under Medicare Part A for the skilled nursing services it provides.

321. CMS and NGS's demand for recoupment constitutes a deprivation of that property interest.

322. Defendants have failed to afford Pinnacle adequate procedural safeguards to protect its interest.

323. The administrative review process, 42 C.F.R. § 405.904(a)(2), does not provide Plaintiff with adequate procedural protections.

324. Pursuant to CMS's recoupment letter, interest on the $31 million demanded will accrue at a rate of nearly $10,000 *per day* regardless of the status of the administrative appeal.

325. This crushing, unchecked accrual of interest further demonstrates that the procedural protections offered by Defendants are woefully inadequate.

326. If Pinnacle is subject to this massive recoupment and interest, it will be forced to cease operations, its doors will close, and hundreds of vulnerable residents, many with no viable alternative placements, will face immediate and life-threatening displacement.

327. Absent immediate equitable relief, Pinnacle will be unable to secure meaningful judicial review of CMS and NGS's demand for recoupment, because Pinnacle will no longer exist as a direct result of that demand for recoupment.

328. Plaintiff, its patients, medical professionals, and staff face imminent harm due to Defendants' failure to afford Plaintiff procedural due process.

329. Plaintiff has no adequate remedy at law and only the equitable relief requested in this complaint will remedy these harms.

## CAUSE OF ACTION IV
**Deprivation of substantive due process (U.S. Const. amend. V)**

330. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

331. Pinnacle has a constitutionally protected property interest in the payments it received under Medicare Part A for the skilled nursing services it provided.

332. Defendants' demand for repayment of more than $31 million is an arbitrary, oppressive, and irrational infringement of Pinnacle's substantive due process rights under the Fifth Amendment that shocks the conscience.

333. Defendants' retroactive application of a PDPM regulatory framework that did not exist at the time of the underlying care and claims submissions is an arbitrary, oppressive, and irrational infringement of Pinnacle's substantive due process rights that shocks the conscience.

334. Defendants' refusal to apply governing law, including federal and state COVID waivers and orders, in place at the time of the underlying care and claims submissions is an arbitrary, oppressive, and irrational infringement of Pinnacle's substantive due process rights that shocks the conscience.

335. Defendants' refusal to explain their secretive audit process is an arbitrary, oppressive, and irrational infringement of Pinnacle's substantive due process rights that shocks the conscience.

336. Defendants' assessment of interest accruing at a rate of nearly $10,000 per day regardless of the status of the administrative or judicial review is an arbitrary, oppressive, and irrational infringement of Pinnacle's substantive due process rights that shocks the conscience.

337. CMS and NGS's demand that Pinnacle pay more than $31 million is grossly disproportionate to the administrative shortcomings the audit alleges and is an arbitrary, oppressive, and irrational infringement of Pinnacle's substantive due process rights that shocks the conscience.

338. Requiring Pinnacle to repay $31 million would immediately put the facility out of business.

339. This has dire implications not just for Pinnacle and the health care professionals it employs, but also for the community that it serves.

340. The audit does not allege intentional wrongdoing or malfeasance.

341. Pinnacle has already agreed to undertake training to ensure compliance with the PDPM criteria going forward.

342. The threat of potentially catastrophic penalties also has broader public policy implications.

343. Penalizing Pinnacle for complying in good faith with emergency waivers and executive orders during a PHE sends a clear message to other skilled nursing facility operators that no amount of attempted compliance will keep them safe from retroactive, arbitrary, oppressive, irrational application of audit criteria.

344. This unfounded application of audit criteria runs the risk of reducing the overall availability of care across the region, and potentially the country.

345. By way of comparison, 42 C.F.R. § 401.607(c)(2), recognizes "hardship" when overpayments equal or exceed 10 percent of annual Medicare payments.

346. Pinnacle's total Medicare payments for 2024 totaled $11,534,524.

347. The overpayment extrapolated by OIG and demanded by CMS is nearly ***30 times*** the threshold that is considered "hardship" under regulatory standards.

348. Plaintiff, its patients, medical professionals, and staff face imminent harm due to Defendants' violation of Plaintiff's substantive due process rights.

349. Plaintiff has no adequate remedy at law and only the equitable relief requested in this complaint will remedy these harms.

## CAUSE OF ACTION V

### Infringement of powers reserved to the state (U.S. Const. amend. X)

350. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

351. The Tenth Amendment to the United States Constitution provides "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

352. This broad reservation of powers to the states encompasses health and emergency powers, including regulation and standards of medical practice, licensing, and issuance of emergency orders.

353. The Governor of the State of New York issued Executive Order 202.10 pursuant to the state's core police powers.

354. EO 202.10 involved triaging authority, scope-of-practice adjustments, documentation waivers, record-keeping modifications, and direct instructions on patient-care prioritization. All of these are traditional state medical-practice and health-administration areas that do not intrude on any exclusively federal field.

355. The Section 1135 waivers prioritizing "people over paperwork" operated in parallel with EO 202.10 because Congress intended flexibility, not federal domination, during emergencies.

356. Because EO 202.10 was a valid exercise of the State's police powers under the Tenth Amendment, Defendants cannot now retroactively attempt to override the state directives prioritizing people over paperwork.

357. Plaintiff, its patients, medical professionals, and staff face imminent harm due to Defendants' violation of the Tenth Amendment.

358. Plaintiff has no adequate remedy at law and only the equitable relief requested in this complaint will remedy these harms.

**CAUSE OF ACTION VI**
**Violation of the Medicare Act (42 U.S.C. § 1395 et seq.)**

359. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

360. Under the Medicare Act, an SNF "shall be paid" for "the services furnished by it." 42 U.S.C. § 1395g(a).

361. Defendants cannot, through the use of their constitutionally deficient audit, deprive Pinnacle of Medicare reimbursements to which it was and is entitled.

362. By demanding recoupment of Medicare payments that were lawfully and properly paid, HHS and CMS have failed to comply with their non-discretionary obligations under 42 U.S.C. § 1395g(a).

363. The failure to comply with 42 U.S.C. § 1395g(a) constitutes an agency action that is "not in accordance with law." 5 U.S.C. § 706.

364. Plaintiff, its patients, medical professionals, and staff face imminent harm due to HHS's failure to comply with 42 U.S.C. § 1395g(a).

365. Plaintiff has no adequate remedy at law and only the equitable relief requested in this complaint will remedy these harms.

**CAUSE OF ACTION VII**
**Arbitrary and capricious agency action and abuse of discretion (5 U.S.C. § 706(2)(A))**

366. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

367. The audit and consequent demand for recoupment are arbitrary and capricious and constitute an abuse of discretion because Defendants relied on factors Congress did not intend them to consider, failed to consider important aspects of the problem, offered explanations that run counter to the evidence before them, and reached conclusions so implausible that they cannot be attributed to a difference in view or agency expertise.

368. Defendants failed to apply the governing law in place during the audit period.

369. Defendants failed to take into account waivers and other legally binding government directives that were in place during the audit period that applied to skilled nursing facilities.

370. HHS, CMS, and NGS guidance specifically directed SNFs to prioritize patient outcomes over paperwork requirements during the PHE.

371. HHS, CMS, and NGS guidance specifically directed SNFs to follow state guidance during the PHE.

372. New York State EO 202.10 waived paperwork requirements in favor of prioritizing patient care and outcomes.

373. Auditing the 2020–2021 Medicare payments without reference to the context of the COVID PHE, and specifically without taking into account legally binding agency guidance, renders the audit arbitrary and capricious and an abuse of discretion.

374. OIG rejected Pinnacle's detailed explanations of the audited cases without reason.

375. CMS then uncritically adopted OIG's findings wholesale.

376. By demanding recoupment of Medicare payments based on an audit that constituted arbitrary and capricious agency action and an abuse of discretion, HHS and CMS have failed to comply with their non-discretionary duty under 42 U.S.C. § 1395g(a).

377. The failure to comply with 42 U.S.C. § 1395g(a) constitutes an agency action that is "not in accordance with law." 5 U.S.C. § 706.

378. Plaintiff, its patients, medical professionals, and staff face imminent harm due to HHS's failure to comply with 42 U.S.C. § 1395g(a).

379. Plaintiff has no adequate remedy at law and only the equitable relief requested in this complaint will remedy these harms.

**CAUSE OF ACTION VIII**
**Agency action in excess of statutory authority (5 U.S.C. § 706(2)(C))**

380. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

381. Defendants completely disregarded the legally controlling waivers and other guidance that were in place during the audit period.

382. Defendants are bound to apply the law, not impose their own policy preferences or retroactively apply rules that were not controlling at the time care was provided.

383. Guidance on best practices for COVID was constantly changing in the early days, including with respect to effective treatments.

384. Administration of IV drugs requires skilled nursing services.

385. CMS audits must defer to contemporaneous, documented emergency medical decisions.

386. Pinnacle's patient outcomes were so effective, in fact, that the State thought they were underreporting their deaths. As the State later determined, these suspicions were unfounded. Pinnacle was simply providing better patient care than other comparable facilities. It should not now be penalized for keeping people alive.

387. The audit and consequent demand for recoupment constitutes an attempt by Defendants to act as policymakers, second-guessing medical decisions, rather than as auditors.

388. By demanding recoupment of Medicare payments based on an audit that exceeded HHS's statutory authority, HHS and CMS have failed to comply with their non-discretionary duty under 42 U.S.C. § 1395g(a).

389. The failure to comply with 42 U.S.C. § 1395g(a) constitutes an agency action that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706.

390. Plaintiff, its patients, medical professionals, and staff face imminent harm due to HHS's failure to comply with 42 U.S.C. § 1395g(a).

391. Plaintiff has no adequate remedy at law and only the equitable relief requested in this complaint will remedy these harms.

**WHEREFORE**, Plaintiff respectfully requests that this Court grant judgment to Plaintiff as follows:

(1) A declaration that:

a. The OIG Report violates the due process protections of the Fifth Amendment and is therefore invalid;

b. the Demand Letter, Corrected Redetermination Decision, and Revised Demand Letter violate the due process protections of the Fifth Amendment and are therefore invalid;

c. Defendants lack statutory authority to demand or recoup the alleged overpayment under the circumstances presented;

d. Defendants' original and revised reimbursement demands are unlawful, ultra vires, and unenforceable; and

e. any ongoing or threatened recoupment violates federal law and the Constitution of the United States.

(2) An order vacating the reimbursement determinations and any related recoupment decisions.

(3) A writ of mandamus compelling Defendants to withdraw the unlawful reimbursement demands.

(4) A preliminary injunction enjoining Defendants from enforcing, collecting, offsetting, or recouping the alleged Medicare reimbursement demands.

(5) A permanent injunction enjoining Defendants from enforcing, collecting, offsetting, or recouping the alleged Medicare reimbursement demands.

(6) Such other and further relief as the Court deems just and proper.

Dated: Brooklyn, New York
September 3, 2026

**ABRAMS FENSTERMAN, LLP**

By: ______________________
Alyssa A. Friedman, Esq.
*Attorneys for Plaintiff*
1 Metrotech Center, Suite 1701
Brooklyn, New York 11201
Telephone: 718-215-5300
AFriedman@abramslaw.com